1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11  BIBIJI INDERJIT KAUR PURI,              )    Case No. CV 11-9503 FMO (SHx)
                                            )
12              Plaintiff,                  )
                                            )
13        v.                                )    **ORDER RE: MOTION FOR SUMMARY**
                                            )    **JUDGMENT, OR, IN THE ALTERNATIVE,**
14  YOGI BHAJAN ADMINISTRATIVE              )    **SUMMARY ADJUDICATION**
    TRUST, et al.,                          )
15                                          )
                Defendants.                 )
16  _____        )

17        Having reviewed all the briefing filed with respect to the defendants' motion for summary

18  judgment, the court concludes that oral argument is not necessary and orders as follows.  See

19  Fed. R. Civ. P. 78; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

20                                    **INTRODUCTION**

21        On November 11, 2011, plaintiff Bibiji Inderjit Kaur Puri ("plaintiff" or "Bibiji"), filed a

22  complaint against the Yogi Bhajan Administrative Trust ("Admin. Trust" or "YB Trust"), Shakti

23  Parwha Kaur Khalsa ("Shakti"), Ek Ong Kar Kaur Khalsa ("Ek Ong"),[1] and Golden Temple of

24  Oregon, LLC ("GTO"), asserting claims for (1) federal statutory and common law trademark

25  infringement, 15 U.S.C. §§ 1051 et seq.; (2) violation of Section 43(a) of the Lanham Act, 15

26  U.S.C. § 1125(a); (3) unfair competition under California common law; (4) violation of California

27  _____

28        [1]  Shakti and Ek Ong are sued in their capacities as trustees of the YB Trust.

1   Business & Professions Code §§ 17200, et seq.; (5) imposition of constructive trust, Cal. Civ.

2   Code § 2224; (6) declaratory relief; (7) breach of fiduciary duties; (8) waste; and (9) interference

3   with prospective economic advantage.  (See Complaint at ¶¶ 36-91).  On November 21, 2011,

4   plaintiff filed a First Amended Complaint ("FAC"), asserting the same claims against the same

5   defendants with the exception of GTO.  (See FAC at ¶¶ 3-6 & 35-91).

6          On February 13, 2012, the court stayed the action pending resolution of related litigation

7   in New Mexico.  (See Court's Order of February 13, 2012, at 1; see also Court's Order of March

8   8, 2012).  On September 10, 2012, the court administratively re-opened a then-pending motion

9   to dismiss.  On January 18, 2013, the matter was assigned to the undersigned pursuant to Order

10   of the Chief Judge.  On March 4, 2013, plaintiff filed the operative Second Amended Complaint

11   ("SAC"), against only Shakti and Ek Ong[2] (collectively, "Trustees" or "defendants"), and asserting

12   the same claims as in the prior iterations of the complaint.  (See SAC at ¶¶ 3-6 & 34-86).

13                              **SUMMARY OF FACTS**[3]

14   I.     THE MARKS AND THE LIVING TRUST.

15          This action primarily concerns the ownership of and use of trademarks and other intellectual

16   property relating to the name and likeness of Yogi Bhajan (sometimes referred to as "YB").  (See

17   Joint Opening Brief re Motion for Summary Judgment, or, in the Alternative, Summary

18   Adjudication ("Joint Br.") at 1).  The trademarks at issue, "Yogi," "Yogi Tea," and "Peace Cereal"

19   (along with other related marks) are collectively referred to as the "Marks" or "HSKY."[4]  (See SAC

20

21          [2] Although the Administrative Trust is identified as a defendant in the SAC, (see SAC at ¶ 4),
    it is not identified in the caption page, presumably because the court had previously dismissed the

22   Administrative Trust from this action.  (See Court's Order of October 15, 2012, at 1).  To the extent
    plaintiff seeks to assert claims against the Administrative Trust, such claims are dismissed.

23

24          [3] Unless otherwise indicated, all facts set forth below are undisputed.  Although many of the
    facts are not in the parties' Joint Statement of Uncontroverted Facts ("JSUF"), plaintiff "adopts the

25   facts recited by the Trustees" in the Joint Brief and also purports to identify "corrections" and
    additional facts.  (See Joint Br. at 5).  Most of plaintiff's facts relate to the litigation surrounding

26   ownership and use of the Marks.  (See id. at 5-7).  Accordingly, the court will cite to the Joint Brief
    to the extent the facts are relevant.

27

28          [4] According to plaintiff, the HSKY Marks "refer[] to all marks identified with or used by Yogi
    Bhajan."  (See Joint Br. at 5 n. 5).

at ¶ 36).  In 1987, Yogi Bhajan and Bibiji created a Living Trust (occasionally referred to as "LT"), which provided that if Yogi Bhajan predeceased Bibiji, she would receive, among other things, half of the community property held in the Living Trust, and the remainder of Yogi Bhajan's share of the Living Trust assets would be placed in trust for the benefit of certain individuals.  (See Joint Br. at 1).

In February 2004, Bibiji and Yogi Bhajan amended the Living Trust to provide for the disposition of any intellectual property held by the Living Trust ("2004 Amendment").  (See Joint Br. at 1).  Pursuant to the 2004 Amendment, Bibiji was to receive 50% of the intellectual property titled in the Living Trust, (see id.), while a majority of Yogi Bhajan's 50% community property interest in the Living Trust assets was to be distributed to Staff Endowment LLC ("Staff Endowment"), a limited liability company organized to receive the Living Trust assets and which would act as a "pension" for the benefit of the members of Staff Endowment, who were individuals who had worked with Yogi Bhajan and his various entities for many years.  (See id.).

Yogi Bhajan died in October 2004, (see Joint Br. at 1; SAC at ¶ 15), and was succeeded as trustee by  Shakti, Ek Ong, and Sopurkh Kaur.[5]  (See Joint Br. at 1-2, 3 n. 3).  Pursuant to the terms of the Living Trust, two trusts were created: (1) Bibiji's Survivor's Trust, which was created to receive her distribution of Living Trust assets, and (2) the YB Trust, which was created to hold, until distribution, Yogi Bhajan's residual interest in the Living Trust assets.  (Id. at 2).  The successor trustees distributed a 50% interest each to Bibiji's Survivor's Trust and to the YB Trust, including the Marks.  (See id. at 2).  However, according to defendants, termination of the YB Trust cannot occur until Yogi Bhajan's share of the Living Trust assets has been distributed to Staff Endowment.  (See id. at 2, citing NMSA 46A-8-817; Cal. Prob. Code § 15410).  Because of ongoing litigation between the successor trustees and Bibiji, (see Joint Br. at 2), the successor trustees have not yet distributed Yogi Bhajan's residual trust assets to Staff Endowment.  (See id.).  Those assets are currently being held in the YB Trust.  (See id.).

---

[5]  Sopurkh Kaur is no longer a trustee and is not named as a defendant in this action.  (See, Joint Br. at 3 n. 3).

1    II.    PRIOR LITIGATION AND LICENSES WITH GTO.

2         A.    The Arbitration.

3         In or around 1984, some of Yogi Bhajan's students formed a company to market and sell

4    tea.  (See SAC at ¶ 17).  Yogi Bhajan granted the company, originally known as the Yogi Tea

5    Company, a license to use his name and likeness and the trademark "Yogi Tea" to market teas

6    based on his formulas.  (See id.).

7         In or around 2008, the successor-in-interest to Yogi Tea Company – GTO[6] – stopped

8    paying royalties under the then-current license, although it continued to use the Marks.  (See Joint

9    Br. at 2, 6; SAC at ¶¶ 21-22).

10        In 2010, Bibiji sued GTO for trademark infringement, contending that she had an ownership

11   interest in the Marks and that GTO had no right to use them absent a license agreement.  (See

12   Joint Br. at 2; SAC at ¶ 24).  Bibiji asked the Trustees to join her in the arbitration against GTO

13   over ownership of the Marks, but they refused.  (See JSUF at P10).  After the action was referred

14   to arbitration, the arbitration panel decided in Bibiji's favor and enjoined GTO from using the Marks

15   and other related marks as of January 1, 2012.  (See Joint Br. at 2; SAC at ¶ 24; Joint Appendix

16   ("Joint App'x"), Tab 17 (Declaration of Matthew N. Falley in Support of Motion to Dismiss First

17   Amended Complaint) ("Falley Decl."), Exh. 2 ("Arbitration Award") at 382).  The Trustees

18   congratulated Bibiji on her success.  (See JSUF at P11).

19        B.    The Trustees' Licenses With GTO.

20        Following the arbitration panel's decision, GTO entered into negotiations with both Bibiji and

21   defendants for a new license to use the disputed trademarks.  (See Joint Br. at 3; SAC at ¶ 26).

22   However, only defendants ultimately executed an Interim License Agreement ("ILA") with GTO.

23   (See Joint Br. 3; Joint App'x at Tab 31 (ILA)).  The ILA allowed GTO to continue using the Marks

24   for food and beverage products in exchange for royalty payments.  (See Joint Br. at 3; SAC at ¶

25

26   _____

27        [6]  In 2012, GTO changed its management and its name to East West Tea Company ("EWTC").
     (See Joint Br. at 2 n. 2; SAC at ¶¶ 22, 32).  For purposes of clarity and consistency, the court will
28   use GTO throughout this Order.

1  27; ILA at § 1.A.).  Although the same terms were extended to Bibiji, she declined to accept them.

2  (See ILA at § 1.D.).

3         In December 2012, the Trustees and GTO negotiated a longer-term Intellectual Property

4  License Agreement ("IPLA") relating only to the Trustee's 50% interest in the Marks.  (See Joint

5  Br. at 3; Joint App'x, Tab 32 (IPLA) at § 2 ("The Trust currently owns and will continue to own an

6  undivided fifty percent interest in the Intellectual Property.") & § 10(vi)[7] ("It is acknowledged and

7  understood that the YOGI Trademarks are co-owned by The Trust and . . . Bibiji . . . and nothing

8  in this Agreement purports, or is intended, to affect Bibiji's co-ownership in any intellectual

9  property.  All royalties paid under this Agreement are paid for the use of the Trusts's interest in the

10  Intellectual Property.")).  GTO offered Bibiji substantially the same material terms and conditions,

11  but Bibiji did not accept the offer.  (See Joint Br. at 3; IPLA at § 10(viii)).

12         C.      The New Mexico Trust Action and Probate Proceedings.

13         Soon after Yogi Bhajan's death in 2004, Bibiji questioned the calculation of her share of the

14  Living Trust assets.  Accordingly, in 2007, the successor trustees brought an action for declaratory

15  relief against Bibiji in New Mexico state court, captioned Khalsa v. Puri, D-101-CV-2007-02431

16  (the "Trust Action").  (See Joint Br. at 3).  The successor trustees claimed that while they believed

17  Bibiji had received all community assets to which she was entitled, she had asserted claims

18  against the assets in the YB Trust, which prevented their distribution.  (Id. at 4; see also Falley

19  Decl., Exh. 6 ("Trust Action Complaint") at ¶¶ 4-6).

20         Bibiji asserted counterclaims for an accounting, breach of trust, breach of fiduciary duty,

21  and for removal of certain trustees due to an alleged conflict of interest.  (See Falley Decl., Exh.

22  7 ("Trust Action Answer") at 4-9).  Bibiji alleged that the successor trustees "failed to fully identify

23  and account for Living Trust assets received, managed and distributed," (see id. at 6; Joint Br. at

24  4), and that they breached their fiduciary duty to her as a beneficiary of the Living Trust.  (See

25  Trust Action Answer at 7; Joint Br. at 4).  Bibiji also claimed that the community assets in the

26

27  ─────────────────

28         [7] The court notes that the IPLA contains three sections numbered "10."  The section 10 cited
       here refers to the one located on page 4 of the IPLA.

1  Living Trust should be "equitably reallocated" because Yogi Bhajan had made excessive charitable

2  contributions of community property without her consent, requiring a reallocation of Living Trust

3  assets in her favor through reduction of the residual share that would otherwise be distributed to

4  Staff Endowment.  (See Joint Br. at 4, 7).

5      In 2009, while the Trust Action was ongoing, Bibiji filed a petition in the New Mexico probate

6  court ("Probate Proceedings") to appoint a personal representative ("PR") to confirm title to Yogi

7  Bhajan's assets.  (See Joint Br. at 4 n. 4; Falley Decl., Exh. 9 at 460).

8      On April 2, 2012, Judge Singleton, the judge in the Trust Action, held a five-day bench trial

9  on Bibiji's counterclaims against the successor trustees, including Shakti and Ek Ong.  (See JSUF

10  at D3-D4; Joint App'x, Tab 4 ("Trust Action Judgment") at 1).  Following trial, the court entered a

11  Decision on August 8, 2012, (see Joint App'x at Tab 2 ("Trust Action Decision")), Findings of Fact

12  and Conclusions of Law on October 16, 2012, (see Joint App'x at Tab 3 ("Trust Action Findings")),

13  and Judgment.  (See Trust Action Judgment).  The Trust Action Judgment adopted and

14  incorporated by reference "all of the Findings of Fact and Conclusions of Law entered on October

15  16, 2012[.]"  (Id. at ¶ 2).

16      As relevant here, Judge Singleton found the following:  (1) "The YB Trust and Bibiji share

17  a 50% ownership interest in all of the Living Trust's IP, including the Yogi Bhajan trademarks (the

18  'Marks')," (Trust Action Findings at ¶ V; JSUF at D7); (2) "Bibiji was, and is, entitled to one-half of

19  the Marks, and her share was distributed to her by the Trustees[,]" (Trust Action Findings at ¶ X;

20  JSUF at D8); (3) "The [YB] Trust holds one-half of the Marks for the benefit of the sole remaining

21  beneficiary of the Living trust[,]" (Trust Action Findings at ¶ Y; JSUF at D9); (4) "The Trustees do

22  not hold one-half of the intellectual property interest in the Marks in a fiduciary capacity to Bibiji[,]"

23  (Trust Action Findings at ¶ Z; JSUF at D10); (5) "The legal relationship between the YB Trust and

24  Bibiji, as it related to the Marks, is that of co-owners of the Mark[s],]" (Trust Action Findings at ¶

25  AA; JSUF at D11); (6) "An owner does not infringe upon his co-owner's rights in a trademark by

26  exercising his own right of use and co-owner does not dilute the other co-owner's rights by

27  exercising his own right of use[,]" (Trust Action Findings at ¶ BB; JSUF at D12); (7) "The Trustees

28  were within their rights as co-owners to negotiate and issue the Interim License Agreement[,]"

(Trust Action Findings at ¶ CC; JSUF at D13); and (8) "The Trustees did not breach their duties to protect and preserve trust assets, but instead, they created an income stream for Staff Endowment, LLC, the Living Trust['s] sole residual beneficiary, maintained the active presence of the YB IP in the marketplace, and generated a potential sale for the benefit of all residual beneficiaries." (Trust Action Findings at ¶ HH; JSUF at D14).

On November 19, 2014, the New Mexico Court of Appeals affirmed the trial court's judgment, (see Notice of Appellate Court Affirmance As Supplemental Authority in Support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication at Exh. A ("NM Court of Appeals Decision"), and on January 14, 2015, the New Mexico Supreme Court denied Bibiji's petition for writ of certiorari. (See Supplemental Memorandum of Points and Authorities Re: Status of Related Matters ("Def. Supp. Br.") at 4; Request for Judicial Notice ("Def. Supp. RJN") at Exh. B).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure[8] authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

---

[8] All further "Rule" references are to the Federal Rules of Civil Procedure.

1    If the moving party has sustained its burden, the burden then shifts to the nonmovant to

2    identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as

3    to material facts on the elements that the moving party has contested. Celotex, 477 U.S. at 324,

4    106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly

5    supported motion for summary judgment "must set forth specific facts showing that there is a

6    genuine issue for trial.").[9]  A factual dispute is material only if it affects the outcome of the litigation

7    and requires a trial to resolve the parties' differing versions of the truth. SEC v. Seaboard Corp.,

8    677 F.2d 1301, 1306 (9th Cir. 1982).  Summary judgment must be granted for the moving party

9    if the nonmoving party "fails to make a showing sufficient to establish the existence of an element

10   essential to that party's case, and on which that party will bear the burden of proof at trial."

11   Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see also Anderson, 477 U.S. at 252, 106 S.Ct. at

12   2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

13   In determining whether a triable issue of material fact exists, the evidence must be

14   considered in the light most favorable to the nonmoving party. Barlow v. Ground, 943 F.2d 1132,

15   1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206 (1992).  However, summary judgment cannot

16   be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife

17   Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v.

18   Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (requiring more than a

19   "metaphysical doubt" to establish a genuine issue of material fact).  "The mere existence of a

20   scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary

21   judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff."

22   Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

23

24

25

─────────────────

26   [9] "In determining any motion for summary judgment or partial summary judgment, the Court
     may assume that the material facts as claimed and adequately supported by the moving party are
27   admitted to exist without controversy except to the extent that such material facts are (a) included
     in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written
28   evidence filed in opposition to the motion." Local Rule 56-3.

**DISCUSSION**

I.   JUDICIAL ESTOPPEL.

Defendants argue that Bibiji is barred by the doctrine of judicial estoppel from contending that the ownership issues were not resolved in the Trust Action.[10] (See Joint Br. at 16). "Judicial estoppel, sometimes known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Wagner v. Prof'l Eng'rs in Cal. Gov't, 354 F.3d 1036, 1044 (9th Cir. 2004) (internal quotation marks omitted).  It "applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion."  Id.  "[F]ederal law governs the application of judicial estoppel in federal court."  Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 603 (9th Cir. 1996).  Courts consider several factors in deciding whether to apply judicial estoppel, including "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Zedner v. U.S., 547 U.S. 489, 504, 126 S.Ct. 1976, 1987 (2006) (internal quotation marks omitted); Mireles v. Wells Fargo Bank, N.A., 845 F.Supp.2d 1034, 1061 n. 117 (C.D. Cal. 2012) (same).

Here, in opposition to defendants' motion to dismiss the FAC, Bibiji represented to the court that she "ha[d] established her ownership of 50% of the trademark rights in issue through litigation with [GTO]" and that she "claim[ed] ownership of the other 50% as well, and [was] currently litigating that ownership before the courts of New Mexico."  (Opposition to Motion to Dismiss First Amended Complaint ("Opp'n to MTD FAC") at 7).  She asserted that the "ultimate ownership of the other 50% will be determined in th[e] currently pending action in New Mexico."  (Id.).

Based on Bibiji's representations, this court concluded that "[m]atters relevant to the resolution of – and potentially dispositive of much of – this litigation have already been the subject

---

[10]   The court understands defendants' argument to be that the YB Trust "owns" the Marks in trust for distribution to Staff Endowment, and that the trustees were acting within the rights bestowed upon them by the trust documents and New Mexico trust law in executing the ILA and IPLA.  The court refers to ownership in that sense.

of at least one, and potentially two, proceedings in New Mexico (not to mention the arbitration proceeding involving [GTO]).  The court will not yank any ownership determination from the grasp of the New Mexico courts.  As a result, it would seem that the primary basis for Defendants' motion is not appropriate for resolution at this stage by this Court." (Court's Order of February 13, 2012, at 6).  The court further noted that "the whole of this action is either dependent upon or will likely be fully resolved by the pending New Mexico civil litigation." (Id.).  As a result, the court stayed the action to "await an outcome in that case[.]" (Id. at 6-7).  After the parties advised the court of the August 8, 2012, Decision in the Trust Action, the court allowed defendants to file a renewed motion to dismiss.  (See Court's Order of August 30, 2012).  The court then denied defendants' motion to dismiss on collateral estoppel grounds because a "final judgment is one of the prerequisites" and the parties "essentially agree[d] that a final judgment ha[d] not occurred" given the need to submit "post-trial proposed findings of fact and conclusions of law[.]"  (See Court's Order of October 15, 2012, at 1).  The court permitted defendants to again renew their motion once a final judgment was entered.  (See id.).

Bibiji argues that she is not judicially estopped from contending that the ownership issues were not determined in the Trust Action because her statements to the court "were made when Bibiji believed that the trademarks were in the LT because the licenses to GTO were by YB as Trustee for the LT[, and] Bibiji did not find out the trademarks were never placed into the LT until testimony at trial disclosed that fact."  (Joint Br. at 18; see JSUF at P9 & P20; Joint App'x, Tab 24 (excerpts from trial transcript and exhibit)).  According to Bibiji, "[t]hat knowledge was solely in the possession of the Trustees and was not disclosed to Bibiji." (Joint Br. at 18).  However, Bibiji cites no evidence for her contention that she was unaware that the Marks were not in the Living Trust.[11]

---

[11]  Bibiji does point to trial testimony and a trial exhibit as evidence that the Marks had never been placed in the Living Trust.  (See Joint Br. at 6, Joint. App'x at Tab 24).  However, the cited evidence fails to show that Bibiji was unaware that the Marks were not in the Living Trust.  Also, the cited testimony, provided via a rough transcript, is vague, particularly since the transcript does not identify the witness or witnesses providing the testimony.  (See, generally, Joint App'x at Tab 24).  Further, the trial exhibit, the May 24, 2005, Memorandum from Kate Chair Freeland, which Bibiji's counsel contends "discuss[es] the intangible property held by the Trusts[,]" and together with the trial testimony "shows that the Yogi Trademarks were not in the Living Trust at the time

1  (See, generally, id.).  Conspicuously absent is a declaration from Bibiji describing her knowledge

2  regarding when she discovered that the Marks were not in the Living Trust.

3       In any event, although Bibiji took an earlier position that the ownership issues would be

4  determined in the Trust Action, now, with the Trust Action having been fully resolved against her,

5  she is taking a contrary position, i.e., that because the Trust Action findings regarding the

6  ownership issues were dicta, she did not gain an unfair advantage.  In response to her initial

7  representation, the court merely stayed the litigation to await the outcome of the Trust Action, and

8  subsequently permitted defendants to renew their motion to dismiss.  Ultimately, the court denied

9  the renewed motion without prejudice given that a final judgment had not yet been entered in the

10  Trust Action.  (See Court's Order of October 15, 2012, at 1).  While it appears that Bibiji's counsel

11  has been "playing fast and loose with the court[,]" see Wagner, 354 F.3d at 1044, the court is

12  unwilling, under the circumstances here, to find that Bibiji is judicially estopped from contending

13  that the ownership issues were not resolved in the Trust Action.

14  II.   COLLATERAL ESTOPPEL.

15       Defendants contend that several, potentially dispositive, issues have already been litigated

16  in the Trust Action, and are therefore, subject to collateral estoppel.  (See Joint Br. at 9-11).  Bibiji

17  counters that Judge Singleton's findings regarding ownership of the Marks cannot be given

18  preclusive effect because the findings were "dicta" and "Bibiji was precluded from litigating the

19  '[o]wnership [i]ssues' as a result of the Probate Court's mistaken belief that the Marks were assets

20  of the Trust and J[udge] Singleton's collateral estoppel order giving preclusive effect to the now

21  reversed Probate Judgment."  (Joint Br. at 11; see JSUF at P3, citing Soni Decl. at ¶ 2; Trust

22  Action Judgment; Joint App'x, Tab 8 (Decision & Order on Trustees' Motion for Summary

23  Judgment On the Issue of Collateral Estoppel) ("Collateral Estoppel Order")).

24       As explained by the Supreme Court,

25

26  _____

27  of Yogi Bhajan's death[,]" (JSUF at P20; see Joint App'x, Tab 19 (Declaration of Surjit P. Soni Re
   Joint Motion for Summary Judgment ("Soni Decl.")) at ¶ 4; Tab 24 (rough trial transcript & exhibit)
28  was also addressed to Bibiji's own estate counsel.  Therefore, at a minimum, Bibiji's counsel was
   aware of the evidence that Bibiji now contends was not disclosed.

1   The preclusive effect of a judgment is defined by claim preclusion and issue
2   preclusion, which are collectively referred to as res judicata.   Under the
3   doctrine of claim preclusion, a final judgment forecloses successive litigation
4   of the very same claim, whether or not relitigation of the claim raises the
5   same issues as the earlier suit.   Issue preclusion, in contrast, bars
6   successive litigation of an issue of fact or law actually litigated and resolved
7   in a valid court determination essential to the prior judgment, even if the issue
8   recurs in the context of a different claim.   By precluding parties from
9   contesting matters that they have had a full and fair opportunity to litigate,
10   these two doctrines protect against the expense and vexation attending
11   multiple lawsuits, conserve judicial resources, and foster reliance on judicial
12   action by minimizing the possibility of inconsistent decisions.

13   Taylor v. Sturgell, 553 U.S. 880, 892, 128 S.Ct. 2161, 2171 (2008) (internal citations, alterations,
14   and footnote omitted).   "In short, a losing litigant deserves no rematch after a defeat fairly
15   suffered."  See B & B Hardware, Inc. v. Hargis Indus., Inc., 135 S.Ct. 1293, 1303 (2015) (internal
16   quotation marks omitted).

17   Under the Full Faith and Credit Act, 28 U.S.C. § 1738, "a federal court must give to a state-
18   court judgment the same preclusive effect as would be given that judgment under the law of the
19   State in which the judgment was rendered."  White v. City of Pasadena, 671 F.3d 918, 926 (9th
20   Cir. 2012) (internal quotation marks omitted).   "If the former judgment is a state court judgment,
21   the court applies the res judicata and collateral estoppel rules of the state."  Lodin v. Bank of
22   America, N.A., 2014 WL 296927, *2 (N.D. Cal. 2014); see Palomar Mobilehome Park Ass'n v. City
23   of San Marcos, 989 F.2d 362, 364 (9th Cir. 1993) ("The Full Faith and Credit Act, 28 U.S.C. §
24   1738, requires that we give the same preclusive effect to a state-court judgment as another court
25   of that State would give.") (internal quotation marks omitted).   Accordingly, the court looks to New
26   Mexico law to determine if the judgment in the Trust Action has preclusive effect in this action.
27   Under New Mexico law, collateral estoppel (or issue preclusion) applies if "(1) the party to
28   be estopped was a party to the prior proceeding, (2) the cause of action in the case presently

12

before the court is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation."[12] Ideal v. Burlington Res. Oil & Gas Co. LP, 148 N.M. 228, 231 (2010); Consumer Data Industry Ass'n v. King, 678 F.3d 898, 904 n. 2 (10th Cir. 2012) (same).  With respect to the latter two prongs, "[i]t is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered."  State ex rel. Peterson v. Aramark Corr. Servs., LLC, 321 P.3d 128, 136 (N.M. Ct. App. 2014) (internal quotation marks omitted).  "The party invoking the doctrine of collateral estoppel has the burden of introducing sufficient evidence for the district court to rule on whether the doctrine is applicable."  Padilla v. Intel Corp., 125 N.M. 698, 701 (1998).  Once a prima facie case is made, "the burden shifts to the party opposing collateral estoppel to show that he or she was not afforded a full and fair opportunity to litigate the issue in the prior proceeding."  Id.; see Salguero v. City of Clovis, 366 F.3d 1168, 1173 (10th Cir. 2004) (same).  Whether collateral estoppel should be applied is within the trial court's discretion.  Ysasi v. Brown, 3 F.Supp.3d 1088, 1146 (D.N.M. 2014).

Here, defendants have made a sufficient showing that the ownership issues were actually litigated and necessarily decided in the Trust Action.  (See Joint Br. at 10-12, 14-15); see also supra, at Discussion, § I.  Bibiji does not appear to contest the first two prongs of the collateral estoppel test.  (See, generally, Joint Br. 12-16).  Instead, she contends that the Trust Action's findings were "dicta[,]" (see id. at 11, 20-21), and that "[t]he subject matter of the two suits was and is different; the ultimate facts or issues raised here were not actually litigated in the Trust Action and the issue was not necessarily determined there."[13]  (Id. at 16).

---

[12]  The second prong merely serves "to distinguish collateral estoppel from its partner in finality doctrines, res judicata, [and is not] . . . a binding requirement describing the cause of action in the second suit."  Braverman v. New Mexico, 2012 WL 5378290, *19 (D.N.M. 2012); see Rosette, Inc. v. U.S. Dept. of the Interior, 142 N.M. 717, 729 (2007) ("In contrast to res judicata, collateral estoppel applies whether or not the two suits involve the same cause of action.").

[13]  Bibiji never adequately explains how the subject matter of the two actions are different. (See, generally, Joint Br. at 16).  Further, even assuming plaintiff had provided a sufficient

1    As an initial matter, Bibiji's contention that Judge Singleton's findings were dicta was

2    addressed by the District of Oregon in <u>Golden Temple of Or., LLC v. Puri</u>, 2014 WL 7405634 (D.

3    Or. 2014).  In that case, which relates to the arbitration proceedings regarding GTO's prior

4    infringing use of the Marks, Bibiji sought to vacate the arbitration award or stay proceedings, and

5    argued, among other things, that the arbitration panel "exceeded its powers by assuming that the

6    Trustees own 50% of the Yogi Marks and that the assumption was based on dicta in Judge

7    Singleton's opinion[.]"  <u>Id.</u> at *2.  Judge Hernandez rejected Bibiji's argument, stating as follows:

8              [I]n the New Mexico case, [Bibiji] argued that she was entitled to a

9              reallocation of her deceased husband's (Yogi Bhajan) half of the community

10             estate.  In particular, [Bibiji] argued that she was entitled to more than 50%

11             interest in the Yogi Marks.    Judge Singleton concluded that the

12             "[Administrative Trust] and [Bibiji] share a 50% ownership interest in all of the

13             Living Trust's IP, including the Yogi Bhajan trademarks (the 'Marks'), that are

14             the subject of the license agreements with GTO and Amalgamated."  The

15             New Mexico Court of Appeals affirmed the finding because it was supported

16             by the evidence in the record. . . . Nothing in Judge Singleton's opinion, or

17             the affirmance by the Court of Appeals, suggests that her findings regarding

18             the shared ownership of the Yogi Marks were dicta.

19   <u>Id.</u>  The court agrees with Judge Hernandez's assessment and conclusion, and finds that Judge

20   Singleton's findings regarding ownership of the Marks were not dicta.[14]

21   _____

22   explanation, plaintiff's contention is irrelevant to the central issue here – whether Judge Singleton's
     findings regarding ownership of the Marks is entitled to preclusive effect.  <u>See</u> <u>Rosette</u>, 142 N.M.

23   at 729 ("The purpose of collateral estoppel is to prevent endless relitigation of the same issues
     under the guise of different causes of action.") (internal quotation marks omitted).

24

25   [14]  Bibiji also contends that the Trust Action's findings regarding ownership of the Marks were
     dicta because "there was never an amendment to conform to proof sought by either party . . . and

26   the New Mexico court precluded amendment to the pleadings[.]" (Joint Br. at 15-16; <u>see</u> <u>also</u> <u>id.</u>
     at 20).  As defendants note, the Trust Action went to trial on Bibiji's cross-claims, including breach

27   of fiduciary duty, since defendants' declaratory relief claim was dismissed.  (<u>See</u> Defendant's
     Reply Brief re Motion for Summary Judgment, or, in the Alternative, Summary Adjudication at 2).

28   In the Pretrial Order, defendants contended they did not breach their duties, in part, because "at

1    In a further attempt to avoid the preclusive effect of the Trust Action, Bibiji contends that

2    she did not have a full and fair opportunity to litigate the ownership issues in that case, (see Joint

3    Br. at 12-14), because Judge Singleton "limited Bibiji's ability to present her case by granting

4    collateral estoppel effect to the Probate Court Judgment which presumed that the Marks were in

5    the LT when in fact they were never placed in the Trust." (Id. at 13; see id. at 11, 23; JSUF at P3,

6    citing Soni Decl. at ¶ 2; Trust Action Judgment; Joint App'x, Tab 8 (Collateral Estoppel Order).

7    Again, this argument is foreclosed by Judge Hernandez's findings.  See Golden Temple of Or.,

8    2014 WL 7405634, at *2.

9    Further, Bibiji's assertion is belied by the record.  The Collateral Estoppel Order merely

10   barred Bibiji "from relitigating whether there was any property that belonged to Yogi Bhajan at the

11   date of his death apart from assets previously identified and distributed by the trustees[, since t]hat

12   issue was actually and necessarily decided by the Probate Action."  (See Collateral Estoppel

13   Order at 108).  Indeed, Judge Singleton rejected the trustees' attempt to "estop Bibiji from litigating

14   the ownership of assets that were identified by the Trustees as property within the Trust on the

15   date of [Yogi Bhajan's] death." (See id. at 109).  Judge Singleton did "not believe that [the Probate

16   Court's] findings actually and necessarily concluded that the Trustees had appropriately identified

17   (and characterized) or distributed the Living Trust Property after the date of Yogi Bhajan's death,

18   which [was] the issue to be decided" in the Trust Action.  (See id.).  Instead, Judge Singleton found

19   that it was "clear that any issues regarding the YOGI and Yogi Tea trademarks were not actually

20   and necessarily litigated in the Probate Action[,]" and therefore ruled that, "[o]n assets of the Living

21   Trust identified and distributed by the Trustees, including the trademarks, there is no issue

22   preclusion."  (Id. at 110).  In short, the Collateral Estoppel Order did not prevent plaintiff from

23   litigating the ownership issues in the Trust Action.  Moreover, contrary to Bibiji's contention, (see

24

_____

25   the time of the license agreement [with GTO,] the Trustees owed only co-owner, not trustee,
     duties to Bibiji with regard to the marks[.]" (Joint App'x, Tab 9 (Pretrial Order) at 3).  Moreover,
26   "[w]hen issues not specifically raised in the pleadings are litigated with either the express or
     implied consent of the parties, the issues are treated as if they had been set forth in the
27   pleadings."  San Juan Water Comm'n v. Taxpayers & Water Users of San Juan Cnty., 116 N.M.
     106, 109 (1993).
28

15

1   Joint Br. at 13), because the Collateral Estoppel Order did not extend to the Marks, the

2   subsequent reversal of the Probate Action order by the New Mexico Court of Appeals did not

3   "fatally undermine[]" the Trust Action's findings regarding ownership of the Marks.

4         Bibiji also argues that she "never had opportunity nor need to address the ownership of the

5   Marks in the Trust [Action] as that was not necessary to determining" the claims in that case.  (See

6   Joint Br. at 13-14).  This argument is without merit and contrary to Bibiji's other contentions.  First,

7   prior to the trial in the Trust Action, Bibiji represented to this court that she was litigating the

8   ownership issues in the Trust Action and that "ultimate ownership of the [disputed] 50% will be

9   determined in that currently pending action[.]"  (Opp'n to MTD FAC at 7).  Given that Bibiji

10  expressed an intent to litigate the ownership issues in the Trust Action, it strains credulity for Bibiji

11  to claim that there was never a need to address such issues.  Second, Bibiji contends elsewhere

12  that she presented evidence during the Trust Action that established the Marks were never titled

13  in the Living Trust, and therefore, were not assets that could pour over into the YB Trust upon Yogi

14  Bhajan's death.  (See Joint Br. at 13, 18, 20-21); see supra at note 11.  Thus, Bibiji not only

15  intended to litigate the ownership issues in the Trust Action, she actually did so by, for instance,

16  eliciting evidence that the Marks were never in the Living Trust to being with.  That Judge

17  Singleton did not place much weight on such evidence does not mean Bibiji did not have the need

18  nor opportunity to litigate the matter.

19        Finally, the New Mexico Court of Appeals addressed Bibiji's "claims that the Trustees

20  breached various duties in their management of the licensing of trademarks[,]" Khalsa v. Puri, 344

21  P.3d 1036, 1044 (N.M. Ct. App. 2014), and her contention "that the Trustees did not have the

22  power to enter into the new licensing agreement with [GTO] because the trademarks were never

23  made assets of the Living Trust."  Id. at 1045.  The New Mexico Court of Appeals determined that

24  the evidence supported Judge Singleton's findings.[15]  Id. at 1044-46.

25

26  ─────────────

27        [15]  Accordingly, the court does not address Bibiji's contention that "[t]he issue of ownership of
    the Marks will now be decided by the Probate Court on remand after investigation by the PR."
28  (Joint Br. at 13).

16

1    In short, the court finds that Bibiji is precluded by collateral estoppel from relitigating

2    ownership of the Marks.  See B & B Hardware, 135 S.Ct. at 1303 ("[A] losing litigant deserves no

3    rematch after a defeat fairly suffered.") (internal quotation marks omitted).

4    III.    TRADEMARK CLAIMS.

5        The SAC asserts claims for federal statutory and common law trademark infringement, 15

6    U.S.C. §§ 1051, et seq.; and (2) violation of Section 43(a) of the Lanham Act, 15 U.S.C. §

7    1125(a).[16]  (See SAC at ¶¶ 34-50; see also Joint Br. at 31).   Bibiji has clarified that her Lanham

8    Act claims are premised on infringement, 15 U.S.C. § 1114, and false designation of origin, 15

9    U.S.C. § 1125(a), (see Joint Br. at 31), and that she does not allege a trademark dilution claim

10   pursuant to 15 U.S.C. § 1125(c).  (See id.).  The court analyzes these claims together.  See Hokto

11   Kinoko Co. v. Concord Farms, Inc., 810 F.Supp.2d 1013, 1031 (C.D. Cal. 2011), aff'd in, 738 F.3d

12   1085 (9th Cir. 2013) ("Whether we call the violation infringement, unfair competition or false

13   designation of origin, the test is identical[: ]is there a likelihood of confusion?") (citing New W.

14   Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979)); Kythera Biopharm., Inc. v.

15   Lithera, Inc., 998 F.Supp.2d 890, 897 (C.D. Cal. 2014) ("A claim for false designation of origin

16   under 15 U.S.C. § 1125 requires proof of the same elements as a claim for trademark infringement

17   under 15 U.S.C. § 1114."); Sennheiser Elec. Corp. v. Eichler, 2013 WL 3811775, *3 (C.D. Cal.

18

19       [16]  Title 15 U.S.C. § 1125(a) provides, in relevant part:

20

21           Any person who, on or in connection with any goods or services, or any
             container for goods, uses in commerce any word, term, name, symbol, or
22           device, or any combination thereof, or any false designation of origin, false
             or misleading description of fact, or false or misleading representation of fact,
23           which – (A) is likely to cause confusion, or to cause mistake, or to deceive as
             to the affiliation, connection, or association of such person with another
24           person, or as to the origin, sponsorship, or approval of his or her goods,
             services, or commercial activities by another person, or (B) in commercial
25           advertising or promotion, misrepresents the nature, characteristics, qualities,
             or geographic origin of his or her or another person's goods, services, or
26           commercial activities, shall be liable in a civil action by any person who
             believes that he or she is or is likely to be damaged by such act.
27

28   15 U.S.C. § 1125(a).

2013) ("A claim for false designation of origin under 15 U.S.C. § 1125 requires proof of identical elements" as a claim for trademark infringement under 15 U.S.C. § 1114.).  To prove a claim of trademark infringement, a plaintiff must show: (1) that she has a valid, protectable trademark, and (2) that defendants' use of the mark is likely to cause confusion.  See Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 969 (9th Cir. 2007).

Bibiji alleges that she is the owner of the Marks and will "own the trademark registrations for the Yogi and Yogi Tea marks upon assignment thereof by [GTO]," (SAC at ¶ 35); that the YB Trust does not own any rights in or to the Marks, (see id. at ¶ 36); and that defendants have unlawfully licensed the Marks to GTO pursuant to the ILA and IPLA.  (See id. at ¶¶ 37-38, 44). According to Bibiji, GTO "has indicated its intent to continue to use, and has continued to use, the Yogi and Yogi Tea trademarks and trade dress beyond the period allowed by the Arbitration Panel to promote and advertise Defendants' Goods which are not authorized, approved, produced or sponsored by Bibiji." (Id. at ¶ 37).  Such use "is likely to cause confusion, deception, or mistake as to the source, affiliation or sponsorship of Defendants' Goods[,]" (id.), and constitutes trademark infringement and false designation and description.  (See id. at ¶¶ 40, 44-46).

As discussed above, Judge Singleton found that "[t]he YB Trust and Bibiji share a 50% ownership interest in all of the Living Trust's IP, including the Yogi Bhajan trademarks[,]" (Trust Action Findings at ¶ V; JSUF at D7), and this finding is subject to collateral estoppel.  See supra at § II.  Judge Singleton also concluded that as co-owners of the Marks, defendants did not infringe upon Bibiji's rights, (see Trust Action Findings at ¶ BB), and instead, "were within their rights as co-owners to negotiate and issue the Interim License Agreement[.]"  (Id. at ¶ CC).

Nonetheless, Bibiji contends that defendants "are not exempt from infringement claims even if they are determined to be co-owners of the marks" because 15 U.S.C. § 1114(1)[17] "permits suit against 'any person' who uses the mark 'without the consent of the registrant' [to] be sued by the

_____

[17]  Title 15 U.S.C. § 1114(1) provides in relevant part: "(1) Any person who shall, without the consent of the registrant . . . use in commerce any reproduction . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, . . . or to deceive . . . shall be liable in a civil action by the registrant[.]"

registrant, which in this case must be recognized to be Bibiji, since the Arbitral Panel's order to assign [the Marks to Bibiji] has been confirmed."  (Joint Br. at 31, citing Joint App'x, Tab 27 ("Arbitration Findings")).  According to Bibiji, "[t]he act of assignment itself only awaits entry of a final order on confirmation."  (Joint Br. at 31).  Bibiji's contentions are unpersuasive.

Although the arbitration panel initially found that the "registrations . . . [were] held in trust by GTO" for the owners of the trademarks, (see Arbitration Findings at 12), and ordered GTO to "assign the Trademark Registrations . . ., along with the respective marks and the good will associated with the marks, to [Bibiji,]" (id.), the arbitration panel subsequently recognized that there was an inconsistency between ownership and registration of the trademarks given Judge Singleton's findings that the YB Trust was a 50% owner of the Marks.  (See Notice of Supplemental Authority in Support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication, Exh. A ("Arbitration Award Upon Remand") at 2) ("There now exists an inconsistency between ownership of the Yogi Marks and ownership of the registrations and applications for the Yogi Marks.").[18]  Subsequently, upon Bibiji's motion to vacate the arbitration award, Judge Hernandez observed that the court "had previously confirmed the assignment of the Yogi Marks to [Bibiji]," Golden Temple of Or., 2014 WL 7405634, at *3, but then remanded that issue to the arbitration panel given the "recognition of the panel's difficulty with its inconsistent ruling between the ownership and the assignment" of the Marks.  Id.  Hence, the arbitration panel's prior order regarding registration of the marks does not aid Bibiji, and contrary to her suggestion, (see Joint Br. at 31), she is not the only registrant of the Marks.  Indeed, upon remand, on March 30, 2015, the Arbitration Panel resolved the inconsistency and awarded 50% ownership of the registrations for the Marks to the Trustees and Bibiji, respectively.  (See Defendants' April 20, 2015, Request for Judicial Notice, Exh. D (March 30, 2015, Findings of Fact

---

[18]   In light of the ILA and Judge Singleton's findings regarding ownership, (see Arbitration Award Upon Remand at 2), the arbitration panel also vacated the previously-ordered injunction and award of infringement damages against GTO for use of the Yogi Marks subsequent to October 1, 2011.  (See id. at 3).

1   and Notice of Second Arbitration Award Upon Remand) at 2).  In short, defendants and Bibiji are

2   registrants of the Marks.[19]

3         Relying on <u>Durango Herald, Inc. v. Riddle</u>, 719 F.Supp. 941 (D. Col. 1988), Bibiji contends

4   further that defendants "could not license GTO to use the Marks exclusively, as they did, because

5   the law does not empower a fractional owner of intellectual property rights to grant exclusive rights

6   that impair the rights of a co-owner." (Joint Br. at 32).  According to Bibiji, the "ILA and IPL[A] are

7   [thus] invalid." (<u>Id</u>.).  Bibiji's contentions are unpersuasive because <u>Durango Herald</u> is inapposite.

8   In that case, the parties owned a soon-to-be dissolved joint venture that owned certain

9   trademarks, and one joint venturer sought to enjoin the other joint venturer's independent use of

10  the trademark following dissolution.  <u>See</u> 719 F.Supp. at 943.  In enjoining use of the trademarks,

11  the court noted that "[t]he joint venture has an indivisible interest in its trademarks and consumer

12  good will.  Reciprocal duties of the joint venturers prevent one from taking unfair advantage of

13  consumer good will to the detriment of the other." <u>Id</u>.  The court explained that "[w]hether the duty

14  flows from the [joint venture agreement] or the fiduciary duties of partners, one partner may not

15  exploit the unique assets of the joint venture to the detriment of the other." <u>Id</u>. at 945.  The instant

16  case does not involve trademarks owned by a joint venture.[20]  Nor is there an agreement

17  governing use of the Marks or the duties owed by the parties to each other.

18        Bibiji's contention is undermined further by Judge Singleton's conclusion that "[t]he Trustees

19  were within their rights as co-owners to negotiate and issue the [ILA]." (Trust Action Findings at

20  ¶ CC).  Likewise, Judge Hernandez flatly rejected Bibiji's argument that the ILA was "clearly

21  unlawful" because it "grants an exclusive right and license" to GTO, finding that "other provisions

22  _____

23     [19]  This conclusion disposes of Bibiji's contention that defendants may be liable for "inducing
    infringement by GTO and contributory infringement since GTO is not authorized to use the YOGI
24  marks by the only recognized owner of the marks." (<u>See</u> Joint Br. at 33).

25     [20]  The court finds Bibiji's reliance on <u>Sybersound Records, Inc. v. UAV Corp.</u>, 517 F.3d 1137
26  (9th Cir. 2008), (<u>see</u> Joint Br. at 32), similarly misplaced since that case did not involve a
    trademark owner suing a co-owner, but rather involved copyrights.  <u>See</u>, <u>generally</u>, <u>Sybersound</u>
27  <u>Records</u>, 517 F.3d 1137.  Moreover, while the Ninth Circuit noted that a co-owner of a copyright
    could not grant exclusive rights to a third party without the consent of co-owners, <u>see id.</u> at 1146
28  here, as noted above, the IPLA recognizes that Bibiji has a 50% ownership interest in the Marks.

in the [ILA] explain that the Trust owns 50% of the Yogi Marks and that '[n]othing in this agreement purports, or is intended, to affect [Bibiji's] co-ownership in any intellectual property.'" Golden Temple of Or., 2014 WL 7405634, at *3 (quoting ILA at IB & IE); (see also Trust Action Findings at ¶ 133). The court sees no reason to depart from Judge Hernandez's analysis. With respect to the IPLA, it expressly relates only to the YB Trusts' 50% interest in the Marks. (See IPLA at § 2 ("The Trust currently owns and will continue to own an undivided fifty percent interest in the Intellectual Property.") & § 10(vi) ("It is acknowledged and understood that the YOGI Trademarks are co-owned by The Trust and . . . Bibiji . . . and nothing in this Agreement purports, or is intended, to affect Bibiji's co-ownership in any intellectual property. All royalties paid under this Agreement are paid for the use of the Trusts's interest in the Intellectual Property.")).

Finally, the court agrees with other courts that have addressed the issue of co-ownership of trademarks and have held that a trademark co-owner does not infringe upon his co-owners rights by exercising his own right of use. See Derminer v. Kramer, 406 F.Supp.2d 756 (E.D. Mich. 2005); Piccari v. GTLO Prods., LLC, 2015 WL 3885023 (E.D. Pa. 2015); Khalsa, 344 P.3d at 1046 ("The district court relied on case law stating that '[a]n owner does not infringe upon his co-owner's rights in a trademark by exercising his own right of use. Likewise, he does not dilute those rights by exercising his own right of use. . . . This is legally correct, according to a leading treatise on the subject.") (citation and internal quotation marks omitted). Bibiji seeks to distinguish Derminer on the basis of the varied statutory language underlying trademark dilution claims pursuant to 15 U.S.C. § 1125(c) and false designation pursuant to 15 U.S.C. § 1125(a). (See Joint Br. at 32). However, Judge Singleton and the New Mexico Court of Appeals both concluded that Bibiji, as a co-owner of the Marks, could not sue another co-owner on trademark infringement or dilutions grounds. (See Trust Action Findings at ¶ BB); Khalsa, 344 P.3d at 1046. Also, in Piccari, the court rejected the plaintiffs' contention that Derminer's reasoning was applicable only to trademark dilution claims, observing that the decision "rested upon the general premise that an owner does not infringe upon his co-owner's rights in a trademark by exercising his own right of use." Piccari, 2015 WL 3885023, at *4 (internal quotation marks omitted). As a leading treatise on trademark law explains, "[w]hen parties are co-owners of a mark, one party cannot sue the other for

infringement.  A co-owner cannot infringe the mark it owns."  2 McCarthy on Trademarks and Unfair Competition § 16:40 (4th ed. 2015) (citations omitted) (hereafter "McCarthy").

The court recognizes that joint ownership of a trademark is in tension with the single source function of trademark law, see McCarthy at § 16:40 ("It is fundamental that a trademark . . . identifies a single, albeit anonymous, source."), and could potentially lead to consumer confusion. According to McCarthy, "[w]hen there is a dispute over who owns a trademark, the worst possible solution is to allow mark ownership to be shared among the warring parties."  Id.  However, it does not appear that plaintiff currently has any goods on the market bearing the Marks that would implicate the single source rule or engender consumer confusion.  (See, generally, SAC).  Nor does Bibiji make such a claim in the Joint Brief.  (See, generally, Joint Br.).  At most, it appears that Bibiji is contending that she would have been able to garner a better deal in licensing the Marks than defendants have with the IPLA,[21] (see, e.g., SAC at ¶¶ 71, 80), or that she has been thwarted in her attempts to license the Marks given the IPLA.  (See SAC at ¶ 83).  In short, the court finds that Bibiji's federal trademark claims fail as a matter of law.[22]

---

[21]  In this regard, Judge Singleton noted that "Bibiji's counsel, Mr. Soni, engaged in other efforts to secure a licensing deal for the YB IP[ and i]n determining with whom to enter a license on behalf of Bibiji, Mr. Soni stated that he looked for a company with a proven and present track record in the tea industry, with an eye and experience towards geographic and market expansion outside of the packaged tea market and into the bulk tea market." (Trust Action Findings at ¶¶ 140-41). Mr. Soni believed the licensee had to be "ethical and honorable" and would have "a combination of integrity, finance, and logistics." (Id. at ¶ 142). Yet, as Judge Singleton found, Bibiji, through Mr. Soni, entered into a licensing agreement with International Beverage Group, LLC ("IBG"), a "brand new company without experience in the tea industry[,]" (id. at ¶ 144), that was formed by Mr. Soni, who was also its counsel. (Id. at ¶ 145).  Judge Singleton noted that Mr. Soni represented both IBG and Bibiji in negotiating and entering into the IBG license in 2011. (Id. at ¶¶ 143, 145-46). Judge Singleton further found that IBG, whose main principal was a man with whom Mr. Soni co-owned other companies, "ha[d] little or no market presence in the tea business and ha[d] little or no history of manufacturing or marketing teas and [did] not seem to meet the basic licensee requirements being sought by Mr. Soni on behalf of Bibiji." (Id. at ¶¶ 147-48).  As best the court can determine, there is no evidence that IBG has placed competing products on the market using any of the Marks. (See, generally, Trust Action Findings; see, e.g., SAC at ¶ 83 (alleging that IPL and IPLA interfered with Bibiji's ongoing negotiations to license the Marks and "prevented Bibiji from consummating any license agreement")).

[22]  Plaintiff failed to file a motion for summary judgment by the deadline set forth in the Scheduling Order.  Accordingly, the court does not address her additional arguments.  (See Joint

1  IV.     REMAINING STATE-LAW CLAIMS.

2        "[I]n any civil action of which the district courts have original jurisdiction, the district courts

3  shall have supplemental jurisdiction over all other claims that are so related to claims in the action

4  within such original jurisdiction that they form part of the same case or controversy under Article

5  III of the United States Constitution."  28 U.S.C. § 1367(a).  However, the power to exercise

6  supplemental jurisdiction is within the court's discretion.  See United Mine Workers of Am. v.

7  Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139 (1966) ("It has consistently been recognized that

8  pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.").  The court "may decline to

9  exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has

10  dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3); see Gibbs,

11  383 U.S. at 726,  86 S.Ct. at 1139 ("Certainly, if the federal claims are dismissed before trial, even

12  though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.");

13  Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) ("The Supreme Court

14  has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are

15  eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction

16  over the remaining state-law claims.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350

17  n. 7, 108 S.Ct. 614, 619 n. 7 (1988)).  Unless the court is persuaded by "considerations of judicial

18  economy, convenience and fairness to litigants" it must "hesitate to exercise jurisdiction over state

19  claims[.]"  Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139.

20        Here, the court's determination that the findings in the Trust Action are entitled to preclusive

21  effect, and that Bibiji's trademark claims fail as a matter of law, means that there are no remaining

22

23  _____

24  Br. at 24-30).  To the extent Bibiji believes the court permitted her to file her own motion given the Court's Order of December 23, 2013, which denied defendants' initial motion for summary

25  judgement without prejudice, (see Court's Order of December 23, 2013, at 1), and directed the parties to meet and confer prior to refiling the motion, (see id. at 1-2), she is mistaken.  The order

26  was directed at the only pending motion for summary judgment, and permitted defendants to "refil[e] their motion only after engaging in the meet-and-confer process and preparing a joint brief

27  as outlined in the court's order.  (See id.; see also id. at 5 (setting deadline for the filing of defendants' "renewed motion")).  Since it was defendants' motion for summary judgment, only they

28  could "file a reply memorandum[.]"  (See id. at 4).

federal claims.  Under the circumstances, the court declines to exercise supplemental jurisdiction over plaintiff's state-law claims and will dismiss those claims without prejudice.  For similar reasons, defendants' counterclaim for declaratory relief, is dismissed without prejudice.

**This Order is not intended for publication.  Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

Based on the foregoing, IT IS ORDERED THAT:

1.   Defendants' Motion for Summary Judgment, or, in the Alternative, Summary Adjudication **(Document No. 113)**, is **granted in part** and **denied in part**.  The Motion is granted as to Count I (federal statutory and common law trademark infringement) and Court II (violation of Section 43(a) of the Lanham Act) based on collateral estoppel. The remaining portion of the Motion is denied.

2.  Plaintiff's state law claims and Defendants' Counterclaim for declaratory judgment are dismissed without prejudice.

3.  Judgment shall be entered accordingly.

Dated this 30th day of October, 2015.

/s/
_____
Fernando M. Olguin
United States District Judge